Good morning. I call case number 20-40-63 Hermann v. Salt Lake City Corporation. Ms. Henry. Good morning, your honors, and may it please the court. My name is Laura Henry and I represent the appellant Jamie Hermann. This court should reverse the decision below because Ms. Hermann has articulated a prima facie case for reassignment under the ADA. And while Ms. Hermann has other claims, truly the issues in this case begin and end with the city's failure to meaningfully consider Ms. Hermann's repeated requests for reassignment over a six-month period. What did she want, though? She never told anybody. She wanted a different manager that fit. She wanted a different department. I mean, what is, where do you draw the line? Certainly, your honor, I think it's actually very clear from the record. And as early as May of 2014, Ms. Hermann's very first interaction with Ms. Green from the city said she wanted reassignment. She wanted to be in a different department that was not the court. Ms. Green testified that this particular request, that of reassignment, was consistent throughout all of her interactions with Ms. Hermann. And so I think while one piece of evidence that the city now heavily relies on, which is the October 7th paperwork submitted by Ms. Hermann's provider, Mr. Klein mentioned supervisory fit. It does. The entirety of the record is there that it's a transfer to a different department. That request is consistent in multiple pieces of evidence, including September 22nd email from Ms. Hermann. Wherein she says that in order to go back to the city, her providers are requesting that she return to a different position in a different department. So I think it was clear, your honor, that what she was always requesting was to be out of the court because the court was what was causing the problem, which was exposure to domestic violence. But only one aspect of her court position did she say was causing the problem, and that was her in courtroom experience with having to take notes and be in the proceedings in the court involving domestic violence victims. Is there anything in the record where she ever responded and explained that somehow that her PTSD was triggered by filing paperwork or doing any of the more administrative and routine matters that she handled outside of the courtroom, that that would somehow trigger her PTSD? I didn't see anything that supported that. Well, I think that her treating provider, Mr. Klein, provided that clarification again in the October 7th paperwork. Now, the city's position is that it needed clarification on the extent to which she needed to be removed from domestic violence cases. And Mr. Klein, Ms. Herman's therapist, had already submitted one type of paperwork in July. The reason he submitted a second set of ADA paperwork in October was specifically because he said that she needs to return to a different department and a different supervisor. And he clarifies at the end that Ms. Herman cannot do any work related to domestic violence. You're talking about, and that's the second time he sent the recommendation. That's the second recommendation. The problem is that he had, leading up to all of that, he does, he says he can't do any work, she can't do any work related to domestic violence. And that's really, doesn't that just ask, make us ask the same question, which is, what is related to domestic violence mean? Does doing paperwork and administrative duties and filing papers have, or electronic filings, have anything to do with domestic violence and cause a trigger? In fact, he provides an explanation in that very same recommendation as to his supporting his recommendation. And he notes that there are two instances that trigger her PTSD. And that's when, first, she's in court listening to domestic violence, and second, when she's sitting in court taking notes. That's the only thing he says as support for his recommendation, that she needs to be transferred. So I don't, there's, I still, even with that statement about related to, he himself, her treater, clearly indicates that it's the in court that's triggering. So I'm still looking for something on the record that means that she can't perform any aspects of her current job. A couple of things. I think, first and foremost, if she couldn't be in court, she couldn't do her job. The city made clear in 2011 that all court clerks had to be in court. And they were willing to accommodate her because they were asking her, all right, it's fine. If you can't be in court, that's one thing. But tell us what, you know, what else, what else do these other things, do these other, you know, jobs that you have that are administrative outside the courtroom. Is there a problem there? And they got no response. And all they got was her treater saying it's the courtroom that's the problem. I think part of the problem here, though, is that Ms. Herman and her provider were trying to participate in a good faith process. And so so what they did, maybe they didn't say it as artfully as they could have. But the question here is, on summary judgment, did they say enough that a reasonable jury could infer from that that she clarified the request? And I think the fact that her medical provider says she can't do any work after the city has basically said, can you do some domestic violence tests or say she can't do any work? That's the problem. He talked specifically about the basis for his recommendation. And he said what triggers her her PTSD is her in courtroom taking notes and being present in the courtroom. He said nothing about anything else he said related to domestic violence. And those are the examples he gave. And that's after months of them trying to figure out whether she's talking about anything other than in court. And it's her burden. She can only get a transfer if she shows that she can't perform her existing job or some aspect of her existing job. It's her burden to show that. But your honor, I think that the other problem is that the city took from this interaction, from this paperwork that was submitted on October 7th. Melissa Green testifies that she understood that to mean Ms. Herman could could not do any work. And so the idea that the city was still confused after October 7th, I think, is inconsistent with the record because, again, the city then moves on after October 7th. The city doesn't continue to say we're very confused. We don't know what you mean. They say, okay, you're asking for reassignment. And because you're asking for reassignment, we're now going to talk about these audio recordings, which I think are problematic for other reasons. But the evidence of the city's behavior suggests that they were not confused at that point because they pivoted to saying, okay, we'll now analyze your request for reassignment. So it doesn't make sense to me, based on that behavior, that they were still saying, we don't understand what you're asking for. She wanted a new supervisor. But what kind of a supervisor? Somebody who would fit. Now, what does that mean? I'm sorry, I didn't hear that part. I say then she asked for not just a different job, she wanted a new supervisor. And one that would fit a supervisor that would fit. I just don't know what that means. I don't know if anybody else did either. I mean, she seems to me to have had an obligation to be a little more specific. Your Honor, again, I think the paperwork says what it says. Ms. Herman's provider does mention supervisory fit, and I'm certainly not here to tell you that it doesn't say that. What I am here to say, though, is that there would have been a way, if the city was sincerely confused about that, to ask what that meant. I think the most straightforward way would have been to contact the provider, Gary Klein. How would the city know if it would fit her if she hadn't done something to find out, check with the different departments herself? I think all that Gary Klein is saying in that letter, and I think this is consistent with the repeated requests for reassignment that begin in May, is that she needs to be out of the court. And certainly mentioned supervisors, but that the supervisors simply need to understand the request and help her with it. Again, if the city was sincerely confused on this point, the proper protocol outlined by Ms. Green would have been to contact Gary Klein and say, what do you mean by this? Ms. Green did not do that. She also didn't ask Ms. Herman. Again, if the question is, what did Ms. Herman need? Did Ms. Herman need a particular type of supervisor? Then one would have expected the city to at least ask. If that was the real hang up, then there would have been an obligation to say to Ms. Herman, what is it specifically that you need from a supervisor? Instead, what Ms. Green did is say, I'm going to evaluate these recordings that your medical provider listened to, and I'm going to determine whether or not I agree with his characterization of the interactions on the recording. Wouldn't that be important to do when that person has made their recommendation based on those recordings? That's all he knew. He knew and he purported to rely on those recommendations. Why wouldn't it make sense for the employer to hear those recordings? I think Ms. Green did hear the recording. There's some sort of one of them, apparently, but then there were no more produced, although there was. Well, it's clear from the record, Your Honor, and this is cited by both Ms. Green and Ms. Herman, that Green heard the same recording that Klein heard. The problem was that not that Green didn't hear the same recording that Klein heard. The problem was that Green didn't agree that there was anything problematic with the conduct. Very different because what it was clear prior to this was that Ms. Herman needed reassignment. Ms. Herman could have had really wonderful supervisors or really terrible supervisors. That wouldn't have alleviated the need for her to be removed from the court and the exposure to domestic violence. So Ms. Herman needed reassignment separate and apart from her particular supervisors. So you're saying the supervisory fit angle is just a red herring in this case? Yes, I'm saying that it is something that certainly her medical provider included, but it doesn't change the fundamental request that had been reiterated over the course of months for reassignment to a vacant position. And that the fact that he says supervisory fit doesn't sort of push out completely the request for reassignment, nor the city's understanding based on their own conduct, that Ms. Herman could not complete the essential functions of a court clerk. I see I have about three minutes left, so if it's all right with you, I'll reserve the balance of my time. One other question. She requested additional time. No amount was identified. No assurances that extra time would enable her to return to work. It's just very open ended. Your Honor, so I think for this particular proposition and under this court's precedent in Aubrey v. Cox, what can stand for a request for definitely rather than indefinitely is a projected expectancy of impairment. Mr. Klein did this in FMLA paperwork in August. He projects that Ms. Herman's impairment will be six months. Then he says, yes, we need to reassess this. Then both Mr. Klein and a medical provider, Ms. Foster, both say provide return to work releases on November 30th. And I think that when read in context what they're saying is that Ms. Herman can absolutely return to work on November 30th. The other thing that was key for the court in this case is that he gave the letter to the city where he said that she was not fully recovered and not ready to return. That was on November 12th. So that's correct, but that's also consistent with his timeframe of November 30th, saying she's not ready to return. That's not six months. I mean, that's some time, maybe. Six months was projected in August. So he was saying between August and February. So I think that timeline of November 30th is very much within his original timeline that he projected. I'll reserve the balance now if that's okay. Thank you, counsel. Samantha, may it please the court. Samantha Slark, on behalf of Apelli Salt Lake City. As the courts aware, there are three categories of claims at issue in this appeal. Requests for reasonable accommodation claims, terminate a discrimination claim and a retaliation claim. I'll turn first to Miss Herman's reasonable accommodation claims. Certainly at the district court level, there were three requests and rulings from the district court with respect to three requests. It is somewhat confusing on appeal what Miss Herman, the focus of Miss Herman's appeal. It certainly appears from the briefing that Miss Herman is abandoning any argument with respect to the court's ruling. But with respect to the first request to be removed from domestic violence cases, as she expressed, she concedes in a footnote in her opening brief that she's not challenging that argument. But certainly in some oral argument here today from Miss Herman's counsel, it appears that there's kind of a combination of an argument on appeal here. But certainly, let's address it with respect to how it has been briefed. And the argument that Miss Herman appears to be making with respect to the reassignment claim is this. She appears to be claiming that the October 7th request for a position with new supervisors, in fact, clarified the scope of her request to be removed from all domestic violence cases. And therefore, the district court erred in finding that the city had no duty to look to begin the process of looking for a reassignment for Miss Herman. There are four problems with this argument or this contention of error. The first one is that this is the first time Miss Herman has raised this argument. She didn't argue to the district court that she had ever clarified what the scope of her request was for removal from domestic violence cases. Has she asked for reassignment? I think that you can read the October 7th one as saying I'm asking for reassignment outside of the justice court. But she also says, and that adds a caveat to it, which is the most important. And in fact, takes up all but about three lines of that two page request. She says, but it has to be with supervisors that don't trigger my PTSD. So I think that's accurate way to look at the record and see what that's really. That's really the point of the case, I think, isn't it? Is has she said enough to ask for reassignment generally? Or do we look at this supervisory fit as basically as one would say the tail wagging the dog and that she would have to somehow drill down and say, OK, specifically, I want a supervisor that looks and talks and acts like this. And I think that the answer to that question is twofold is I think, number one, the October 7th notice actually doesn't say enough to clarify what the scope of removal from domestic violence cases is. In fact, it's not. But didn't she ask for reassignment? She did ask for reassignment. And isn't that enough? I don't think it is, because I'm just the middle and break precedent. You look to accommodation within your current role as the preferred accommodation. Right. Yes, exactly. Exactly. Pushes us to look at any other available position, doesn't it? If that's that's correct. But I think the problem here is that we did that. Miss Herman never provided the clarification with regard to the scope of her removal from domestic violence cases to allow the city to get to the second step, which was now to look to reassignments in the dish. That was the position that the district court agreed. Well, what what about her argument she's making, as I understand it today, that. The city was concerned about that and certainly did ask her to be specific about what what it was that was triggering her PTSD. And was it was it just being in court or could she do some filing and more routine administrative type duties? And they were concerned about that. But then at some point and after they received the second support from her treater in support of his recommendation, they dropped that there. They they focus entirely on this issue about supervisors and they don't seem to have any concern any longer about whether she might be able to perform some of the functions of her job. And they could potentially accommodate her in her current position. You see what I'm saying? And I didn't see anything in the record either. It seemed to me that they accepted his statement that she couldn't as being broad, that she couldn't work in any such any situation related to domestic violence. And that is what he said. And that, I think, is interesting. If you look at the request, you'll notice that sort of 98 percent of it talks about how her supervisors are triggering her PTSD. And the city certainly understood the request to have changed from I need to not work in domestic violence cases to my supervisor. There's no question that he had he he was recommending that she not work in domestic violence cases. That was definitely part of his recommendation and recommendation. It was two pronged. So after that, was there is there anything in the record after he makes that kind of broad statement that doesn't specify some duties versus other duties? Is there anything in the record where the city says, well, wait a minute, that's not enough. We've got this supervisor issue over here, but we're still concerned about your own job and whether you might be able to perform some functions of that. And no, there is not. And the court is correct that at that point, the not problematic. You seem to have accepted that statement as sufficient on that part of the request. Well, I don't think it's problematic because that doesn't create a question of fact, I should say. Well, I don't think so, because what would the question of fact? I'm not sure what the question of fact would be. The question of fact would be whether she has done what she needs to do to get to request reassignment, which is to show that she cannot perform any of the functions of her current job. But I think if we even accept the proposition that the October 7th has done enough to say she can't perform the functions of her current job. And now we need to look to reassignment. It's not just a simple. OK, now we need to look to reassignment because there's this giant caveat that the reassignment needs to be to supervisors that don't trigger her PTSD. And there are these recordings that demonstrate that her current supervisors trigger her PTSD. So the city was now looking to see, OK, your reassignment request is twofold. It's I want a new position and I want a position with supervisors that don't trigger my PTSD. So the question then becomes, what is a supervisor? What would be a good supervisory fit for Miss Herman? What kind of supervisor doesn't trigger her PTSD? And of course, we have these recordings out here, which is the sole basis that Dr. Klein reached his conclusion that these supervisors were triggering her PTSD. So then the city endeavors to listen to the recording so that they can identify what supervisor, who an appropriate supervisor might be so they can start to analyze the request to determine if they can even place her with. Aren't you the city making this harder than it needs to be? I mean, they're going to listen to these tapes and think, oh, whoa, wait a minute. I don't like the the rising inflection at the end of each of those sentences that that supervisor has. So we have to find someone that doesn't do. I mean, that's just. That's really beyond what we're required to do when we're looking at a claim. And I think perhaps in retrospect, it would have been because there is, of course, case law that says that a request for new supervisors is presumptively unreasonable. So in a way, I feel like the city has perhaps been penalized for having gone above and beyond in an attempt to see if what Miss Herman was requesting was indeed reasonable. But I think from a purely legal perspective here, I don't know. I don't know if I would call that praise or criticism. I mean, what what was the point of that endeavor? And I would say the endeavor was to see to try to understand what it was, what the issue was that she was claiming she had with her supervisors. What about the interactions which were triggering her PTSD? But I do think that it is important for analyzing a reasonable accommodation claim is that we are sort of in the second area, area of this one. We're looking at whether it's a plausibly reasonable accommodation. The first the first point is that requests for new supervisors are presumptively unreasonable. And Miss Herman hasn't come forward with evidence to rebut that presumption. So we almost don't need to go past that because the the request was not was presumptively unreasonable. So then why go around and around? Give us the tapes. No, I won't give you the tapes. You can have some of the tapes, but not all of the tapes. If you start at square one and say to request such information about suitability of supervisors is irrelevant. Well, if if the city, I guess, I suppose it simply said, like, placing you with another supervisor is unreasonable. Close the request. Then, yes, I suppose we would have a simpler case, but I'm not sure that the city can be penalized for making an attempt to see if they could accommodate Miss Herman. And then, of course, we enter a world where Miss Herman wouldn't provide the tapes said that they were irrelevant, wouldn't give them to us. And so. What I'm confused here. If what you're saying today, if we if we are to find that there's a question of fact as to the as to the as to the first issue, I guess, which we've been talking about, it's trying to figure this out. What whether that even matters on the supervisory issue. If there's if if she should have been granted a reasonable accommodation to a different department, wouldn't she automatically be having a new supervisor? Is that not not true? She would have a new supervisor. Who knows if this supervisor is a good supervisory fit? Well, that's beyond the question, though. If you're obligated, if there's a question of fact at this point about whether you are obligated to accommodate her. By moving her to a different department, it doesn't really matter right now whether you know who the supervisor was. What matters is, did you did you did you make that effort? Did you. Well, I don't think we and I think I did you seek to transfer her. Well, I think the issue is, is that it was a long stream of one thing after the other. Just as the district court found, she never did actually clarify what the scope of her requests were. And as is sort of in the record, you have this long chain going back and forth with respect to asking for that clarification. It not being given. And then the next point we get is this October seven request saying that I want my supervisors, you know, triggering my PTSD. And then we start treating that differently. But you see, you start treating it differently and you seem to accept that she's entitled to a to a to a new to a transfer. And once you reach that point, I don't think it I think you've got you're obligated to make that accommodation. And and you didn't do that. Instead, you terminated her. I don't think that that's necessarily correct, because I think that if you if she's never answered the question with regard to the scope of it, I don't think that's what I'm saying. There may be a fact question there. And that's what I was just telling you when you changed horses and didn't ask her for any more, information about the scope of her or what she could perform and not have her PTSD triggered. You seem to have accepted that in that second recommendation that she had said enough. And so if there's a fact question and we take that to be true, that there's a fact question, she said enough to get herself a new placement, a new department, essentially. Then this whole issue about what supervisor it would be with should not have been anything that you could terminate her for. And I think you would decide after you say, fine, we're going to work with you on this and we're going to grant you the accommodation. We need to do some work to figure out who your supervisor is going to be, but we're not going to fire you. We're going to grant you the accommodation. But I think the problem is that each of the requests kind of started like she would put a request in and would say, what do you mean by this? And then she'd say, oh, never mind. I'm changing the request to this. So then we get into the next conversations. What do you mean by this? And it's like, OK. I'm not going to give you the answer. The problem is we're here at summary judgment. I understand there's been a lot of different facts alleged on both sides. But I we're here at summary judgment. And I don't know. I'm struggling to see why she didn't do enough to say that she was entitled to a to a transfer. Because it wasn't just I mean, number one, she never answered the scope of the request. Well, I'm saying assuming assuming there's a fact question about that. I'm saying assuming she's correct, that there's a fact question that gets you past summary judgment on that. Why do we go any further? Why do we care about the whole supervisor issue? I see that I'm out of time. Would you like me to just like you to respond? Thanks. Sorry. Well, because the issue here is the facts are not in dispute. They're all in documents. It's all in emails. So we don't have a factual dispute for a jury to resolve. So here it is like do these documents do these responses? Are they actually providing the information that we want information that's in her possession? And the district court found that, no, she hadn't reached that because a failure to participate in good faith in the interactive process precludes her ability to bring a reasonable accommodation claim. And that's the issue here with both of her requests. I do. I understand your response. Thank you. Appreciate it. Thank you, counsel. I think there was some rebuttal time. Miss Henry. Yes, your honor. And briefly, I think it's certainly Miss Herman's position that that once once it was clear, or at least there is a genuine issue of fact as to whether or not she did enough to trigger reassignment obligations that she shouldn't have been terminated. And Miss Green explains the reason for her termination in the letter she sends on November 14th to be exclusively about not hearing the conduct on these tapes. She doesn't mention anything about failure to clarify the scope of the previous request. And I think the problem with asserting that that was the real issue is how would Miss Herman know that if if if the city truly couldn't analyze any requests still at this point in November, because of this failure to clarify DB, they gave no indication of that to Miss Herman. And I think this goes to sort of the good faith interactions between the parties that Miss Herman had to rely on the representations of the city at that point, which were that now we're talking about reassignment and now we're talking about about different supervisors. So I think that that is a salient point here. I think that the convoluted record also goes to the fact that this case isn't appropriate at summary judgment, that there are sort of lots of things that could bear out additional information and that at this stage, Miss Herman has done enough to to demonstrate multiple issues of tribal fact. Thank you. Thank you. Thank you.